## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

In Re:                                                    Bankruptcy No. 68–00039

Great Plains Royalty Corporation,                         Chapter 7

                        Debtor.
_____/
Great Plains Royalty Corporation,

                  Plaintiff,

            vs.                                           Adversary No. 13–07018

Earl Schwartz Company and
Basin Minerals, LLC,

                  Defendants.
_____/

Earl Schwartz Company and
Basin Minerals, LLC,

            Counter-Claimants,

            vs.

Great Plains Royalty Corporation,
                  Counter-Defendant.
_____/

### MEMORANDUM AND ORDER

**I.     BACKGROUND INFORMATION & FINDINGS OF FACT**

    **A.     Bankruptcy Proceeding and Sale**

This adversary proceeding stems from events which began on April 12, 1968, when creditors of Plaintiff Great Plains Royalty Corporation initiated this bankruptcy case by filing an involuntary petition under Chapter 11 of the Bankruptcy Code. Great Plains assumed the role of debtor in possession until September 27, 1968, when the Court appointed Myron Atkinson as Trustee in Bankruptcy. On October 5, 1968, the Trustee filed a "Petition For an Order to Show Cause Why Debtor's Petition For Arrangement Under Chapter XI of the Act Should Not Be Withdrawn and Abandoned and the Debtor Be Adjudicated A Bankrupt." Case No. 68–39, Doc.

1

35–2.  In the petition, the Trustee asserted that Great Plains' assets were insufficient to meet its

liabilities and that promptly liquidating the estate was in the best interest of the creditors.  Id.

The Court held a hearing on the petition on October 25, 1968.  Following the hearing, the

Referee in Bankruptcy executed an Adjudication, ruling that Great Plains was "a Bankrupt."

Case No. 68–39, Doc. 35–4.  On the same day, the case was converted to a liquidation

proceeding under Chapter 7 of the Bankruptcy Code.  Case No. 68–39, Doc. 35–5.

On December 5, 1968, the Trustee filed a petition seeking authorization to sell Debtor's

assets "insofar as they are known."  Case No. 68–39, Doc. 32.  Two attorneys, Frank Jestrab

and Daniel Chapman, assisted the Trustee by preparing an Inventory of Great Plains' assets.

See Exs. EB–201 and D–101.  The Inventory included mineral interests, oil and gas leases and

royalty interests.  According to the Trustee who testified at the trial of this adversary proceeding

in October 2014, the entire scope of the assets held by Debtor in late 1968 and early 1969 was

not clear.  The Trustee explained he and Jestrab found Great Plains' records to be "a mess" and

Great Plains did not provide any assistance to the Trustee or the attorneys assisting him.[1]

Jestrab's office prepared the Inventory based on the records the Trustee had at the time.  The

Trustee was not sure which records Jestrab used in preparing the Inventory.  Neither the

Trustee nor the attorneys assisting him conducted a comprehensive title search to ensure the

Inventory included all the assets Great Plains owned because such a search was too costly.

---

[1] As a result of this litigation, Defendants Earl Schwartz Company (ESCO) and Basin Minerals,
LLC, discovered records the Trustee had not seen before which the parties believe were Great
Plains' internal records of its assets.  See. Ex. D–106, EB–213, EB–217, EB–218, and EB–220.
At trial, Chris Greenberg, a landman employed by ESCO and Basin, testified that he discovered
boxes filled with these documents in the basement of an office building used by Eagle
Operating, Inc., a company affiliated with ESCO and Basin at the time Greenberg discovered
the records.  Based on Greenberg's description of the basement in which he found the
documents, the documents were likely in the basement for some time, but the Court received no
evidence regarding when the documents were first stored there or who had access to them.
Greenberg did not indicate when he found the documents.  At trial, Great Plains asked the
Trustee whether he recalled ever seeing or using these records in his work as Trustee in this
case, and he answered "no."

On January 3, 1969, the Referee in Bankruptcy entered an Order authorizing the Trustee to sell assets held by Great Plains' bankruptcy estate.  Case No. 68–39, Doc. 12.  In its Order, the Referee appointed appraisers to determine the value of each of the properties.  See id.  The Appraisers' Report was submitted to the Court on March 12, 1969.  Ex. EB–202.

The Trustee arranged for the sale of Great Plains' assets to take place at the Plainsman Hotel in Williston, North Dakota, on June 5, 1969.  Jestrab and Chapman prepared the Notice of Bankruptcy Sale (Exhibits EB–203 and D–102) and the Trustee published the Notice in newspapers in Williston and Bismarck, North Dakota, and in Billings and Great Falls, Montana.[2]  Case No. 68–39, Doc. 15.  The Trustee testified that he intended to sell all of Great Plains' interest in the assets identified in the Notice of Bankruptcy Sale and that he intended to list for sale all of the assets he had identified and included in the Inventory.  As far as the Trustee was aware, the Inventory was never provided to potential bidders.  At the time of trial, the Trustee could not recall his understanding of the nature of Great Plains' interest in the assets when his attorneys prepared the Notice of Bankruptcy Sale or when the auction occurred.

At the auction, the Trustee first attempted to sell the properties individually.  When he received no bids, he offered all of the properties for sale.  The Trustee declared Earl Schwartz the "high bidder."  Ex. EB–204.  Schwartz purchased the properties for $225,000.[3]  According to the Trustee, Schwartz never asked for clarification regarding the assets offered for sale.

---

[2] In their post-trial brief, ESCO and Basin assert:  "Excerpts of what appears to be a slightly different version of the Notice of Sale, or perhaps Inventory, with Earl Schwartz's handwritten notations were admitted into evidence.  (Ex. EB–210).  The handwritten notations suggest Earl Schwartz had knowledge regarding the nature of the 7/160 Interest and 31% Interest."  Doc. 47, at 7.   The Court received Exhibit EB–210 not because it was offered to show that the Trustee transferred certain property interests to ESCO, but rather to show that Schwartz had knowledge and notice of the property interests listed on the document.  Neither party offered evidence of when Schwartz made the notations or why he made them.

[3] Although Earl Schwartz bid on the assets, the Trustee conveyed the Disputed Assets to ESCO, and ESCO later transferred the assets to Basin.  Exs. EB–227, EB–228 and EB–229.  Robert Mau, the managing partner of ESCO and Basin, testified that Schwartz was not available to testify at trial because he is deceased.

The Referee in Bankruptcy signed an Order confirming the sale on June 19, 1969.  Exs. D–103 and EB–205, at 2.  This Order confirmed "the sale of all of the assets of the bankrupt corporation to Earl Schwartz[.]"  Id.  On February 9, 1970, the Referee in Bankruptcy entered an Amended Order confirming the sale that changed the language of the original Order to confirm the sale of "all of the assets of the bankrupt corporation included in the Notice of Sale to Earl Schwartz[.]"  Exs. D–104 and EB–206, at 1.

Great Plains dissolved shortly after its assets were sold.  It was later reinstated as a corporation.[4]

Years after the bankruptcy auction sale, ESCO discovered title issues with some of the assets Schwartz purchased from the Trustee.  Robert Mau, the managing partner of ESCO and Basin who joined ESCO in the late 1970s, first learned of title issues with these assets 20 or 25 years ago.  At trial, Mau could not recall the specific problems or property interest affected.  Upon learning of the title issues, Mau traveled to the Bankruptcy Court in Fargo to review the Great Plains bankruptcy file.  At or about this time, Mau also became aware of the Amended Order confirming the sale of the assets.  See Exs. D–104 and EB–206.  Mau testified that he interpreted the Amended Order confirming the sale to mean that ESCO obtained all the assets of the bankrupt corporation.  Mau did not perform any title work at this time.

In 1997, Mau signed a unitization[5] agreement on behalf of ESCO.  The unitization agreement listed mineral and working interest owners, including ESCO and Great Plains.  Great

---

[4] In 2011, a North Dakota State District Court entered an Order for Reinstatement of Great Plains.  Case No. 68–39, Doc. 51–1.  The North Dakota Secretary of State executed a Certificate of Good Standing of Great Plains on May 15, 2014.  Id.  Based on this evidence, and other evidence received at a hearing on June 3, 2014, the Court found that Great Plains was reinstated as a corporation under North Dakota law.

[5] Unitization involves "the joint operation of all or some part of a producing reservoir," the purpose of which is to "permit the entire field (or a very substantial portion of it) to be operated as a single entity, without regard to surface boundary lines."  6–9 Williams & Meyers, Oil & Gas Law § 901 (2014).

Plains was listed as a royalty owner in property covered by the Fossum Lease.[6]  Ex. D–130.

Great Plains is not mentioned elsewhere in the document as an owner of any other property.

For a unitization agreement to be successful, a certain percentage of the mineral,

working interest and royalty owners must agree to form a new unit.  According to Gary Preszler,

who Great Plains called to offer expert testimony on oil and gas issues, an operator submits an

application to form a new unit and the North Dakota Industrial Commission must approve it.

After it is approved, the unit operator must obtain ratification of the unit, which requires the

approval of 65% to 70% of owners.

Mau maintained that he reviewed the agreement to ensure ESCO's interests were

protected and did not pay attention to whether Great Plains was listed as an owner because he

"didn't represent them."  Mau stated:  "I just take care of Earl Schwartz Company… I don't have

to worry about anybody else's interest."  Mau claims that the unitization agreement did not alert

him to title discrepancies with the Fossum Lease.

ESCO and Basin admit that they became aware of specific title issues with the Fossum

Lease on or about March 29, 2004.  See Ex. D–129; Doc. 47, at 15 (ESCO and Basin "learned

of issues with the Fossum Lease following title work in 2004 (D–129)").

On or about January 11, 2010, ESCO and Basin received a title opinion advising them of

a title discrepancy with property referred to as the 7/160 Interest.[7]  See Exs. D–118 and EB–

234.[8]  At trial, Chris Greenberg, a landman who works for ESCO and Basin, testified that prior to

---

[6] According to the Unitization Agreement, Great Plains is a royalty owner in property located in
the northwest quarter of the northwest quarter of Section 29, Township 161 North, Range 81
West and in the southwest quarter of the northeast quarter of Section 29, Township 161 North,
Range 81 West.  Ex. D–130, at 3–4.  This property overlaps with the property description given
for the "Base Lease" in the Inventory, but it does not overlap with any of the property
descriptions listed for the Fossum wells on either the Notice of Bankruptcy Sale or in the
Assignment or Correction Assignment.  See Ex. D–125.

[7] See infra, p. 6 for full legal description of the 7/160 Interest.

[8] Exhibit D–118 is an undated title opinion relating to the 7/160 Interest that does not contain
any information identifying who prepared it.  The Court also received Exhibit EB–234, which is

receiving this title opinion, he had no knowledge of any discrepancy with the title to the 7/160 Interest.

ESCO and Basin received notice of title issues relating to the 31% Interest on or about March 20, 2013. Ex. D–123. Mau testified that he had not been alerted to any other issues with the 31% Interest before March 2013.

On April 30, 2013, ESCO and Basin filed a motion to reopen this bankruptcy case and to appoint a Trustee for the purpose of allowing the Trustee to clarify alleged "ambiguities in assignments and conveyances executed by the initial Trustee." Case No. 68–39, Doc. 34. The Court entered an Order granting the motion to reopen the bankruptcy case on May 3, 2013. Case No. 68–39, Doc. 36. On May 3, 2013, the United States Trustee appointed Gene Doeling as Trustee. Case No. 68–39, Doc. 37.

In October 2013, Great Plains filed a Complaint seeking a declaration resolving the parties' dispute regarding the Trustee's conveyances to ESCO. The parties identified five assets (the "Disputed Assets") over which they disagree about whether the Trustee conveyed all of Great Plains' interest in those assets or whether the Trustee conveyed only a specific portion of Great Plains' interest in those assets. Specifically, the parties identified the following Disputed Assets:

> The 7/160 Interest—An undivided 7/160 interest in the oil, gas, and other minerals in and under the NW/4 of Section 8, Township 159, North, Range 94 West, Burke County, North Dakota;
>
> The 31% Interest—An undivided 31% interest in the oil, gas, and other minerals in and under the S/2 and S/2NE/4 of Section 34, Township 164 North, Range 92 West, Burke County, North Dakota;
>
> The Fossum Lease—An oil and gas lease between Gussty Fossum as lessor and Carter Oil Company as lessee for the lessor's interest in the oil and gas in and under the N/2 and SW/4 Section 29, the NE/4 of Section 30, and the S/2 Section 20, Township 161 North, Range 81 West, Bottineau County, North Dakota;

---

identical to Exhibit D–118 except that Exhibit EB–234 has a cover page on letterhead from the Throne Law Office dated January 11, 2010.

The 55/240 Interest—An undivided 55/240 interest in the oil, gas, and other minerals in and under the S/2NW/4 and SW/4 of Section 15, Township 163 North, Range 95 West, Divide County, North Dakota;

The 60/320 Interest—An undivided 60/320 interest in the oil, gas, and other minerals in and under the NW/4 of Section 27 and the SW/4 of Section 22, Township 163 North, Range 95 West, Divide County, North Dakota.

In its Complaint, Great Plains seeks a judgment declaring that ESCO and Basin have no right, title, or interest in any property currently owned by Great Plains or titled in its name. ESCO and Basin filed an Answer and a Counterclaim on December 20, 2013, requesting that the Court enter a judgment declaring that 100% of the Disputed Assets were sold and assigned by the Trustee to ESCO. In their Counterclaim, ESCO and Basin originally sought a declaration that the Trustee intended to, and did in fact, sell and convey all of Great Plains' assets to ESCO, and that Great Plains has no interest in any property it owned prior to the commencement of the bankruptcy proceeding. ESCO and Basin later conceded that Schwartz/ESCO did not purchase all of Great Plains' assets at the auction sale. See Doc. 30, at 1 and 9. ESCO and Basin request that the Court order the Trustee to issue corrective assignments or other conveyances of the Disputed Assets. Great Plains filed an Answer to the Counterclaim on January 3, 2014. Doc. 9.

On April 15, 2014, Trustee Doeling filed a motion seeking authority to sell any remaining interest the bankruptcy estate held in the Disputed Assets to Great Plains for $25,000. Case No. 68–39, Doc. 47. During a hearing held on June 3, 2014, the Court granted his motion and authorized the sale. Accordingly, the bankruptcy estate no longer holds an interest in the Disputed Assets.

The Court held a trial on October 15 and 16, 2014 in Bismarck, North Dakota. At trial, Great Plains offered evidence relating to properties other than the Disputed Assets. Specifically, Great Plains requested that the Court consider evidence regarding properties 6–14 listed on Exhibit D–111. ESCO and Basin objected. The Court sustained the objection and

7

denied Great Plains' request.  Consequently, only the claims relating to the Disputed Assets are addressed in this opinion.

### B.   The Disputed Assets

#### 1.   The 7/160 Interest

The Inventory, Notice of Bankruptcy Sale and Assignment describe the 7/160 Interest in slightly different ways, which ESCO and Basin suggest are mistakes requiring reformation.  In the alternative, ESCO and Basin assert that the discrepancies create ambiguities requiring the Court's interpretation.  "Royalty Interest"[9] is the main heading on the page of the Inventory that lists the 7/160 Interest.  Exs. EB–201 and D–101, at 3.  The Inventory references the "Melvin E. Peterson" well and lists the property description: "NW1/4 of Section 8, Township 159 N, Range 94W."  Id.  A corresponding column with a heading titled "Net Interest in Production" lists ".005469."  Id.

The Notice of Bankruptcy Sale contains a similar property description for this interest— "Melvin E. Peterson-North Tioga Field (Madison Unit) Burke County, North Dakota – NW1/4 Sec. 8 159N–94W."  Exs. EB–203 D–102, at 2.  A corresponding Parcel Number of 33 is also listed.[10]  Id.  Under the "Interest" column appears the word "Royalty," below which "W.I. .005469" is listed.  Id.

The Trustee's Assignment of the 7/160 Interest provides that the Trustee is transferring "the overriding royalty[11] interests described in the exhibit attached hereto and made a part

---

[9] Both parties rely on the Williams & Meyers Oil and Gas Law Treatise for definitions of oil and gas terms.  The Treatise describes a "royalty" as "[t]he landowner's share of production, free of expenses of production" which "is frequently 1/8th production, but it may be any other fractional share of production."  8–R Williams & Meyers, Oil and Gas Law Scope (2014).

[10] At trial, Preszler opined about the significance of the "Parcel Number" listed in the Inventory. He explained that the Parcel Number "33" coincides with the number "33" listed on the Appraisers' Report (Ex. EB–202).  According to Preszler, the parcel numbers were used for the convenience of the appraisers to help identify specific properties, and they have no other significance.

[11] The Williams & Meyers Treatise describes an "overriding royalty" as "[a]n interest in oil and gas produced at the surface, free of expense of production, and in addition to the usual

hereof, insofar, but only insofar as said overriding royalty interests are covered thereby."  Exs. EB–226 and D–117, at 1.  The attachment to the Assignment is titled "Overriding Royalties."  Id. at 2.  The attachment also refers to Parcel Number 33 and the legal description adjacent to it is identical to the legal description for this parcel in the Notice of Bankruptcy Sale.  Id.  There is also a "Royalty" column containing only a ditto mark.  Id.  A column with the heading "Interest" reads ".005469."  Id.

The property descriptions on all three documents are substantially the same, but there are three sources of confusion.  First, the Inventory refers to the 7/160 Interest as a "Net Interest in Production;" the Notice of Bankruptcy Sale refers to it as a "W.I." or working interest;[12] and the Assignment refers to it as an "Interest."  Second, the Inventory page on which the 7/160 Interest appears is titled "Royalty Interest;" the Notice of Bankruptcy Sale also refers to a "Royalty;" but the Assignment refers to an "Overriding Royalty."  Finally, Great Plains' records, as well as a copy of the deed of conveyance to Great Plains, show that Great Plains owned seven net mineral acres in the above-described property, but the parties dispute whether the Trustee intended to transfer the actual mineral acres or merely a royalty interest in the oil and gas produced from a specific well.  Exs. EB–213 and D–117.

---

landowner's royalty reserved to the lessor in an oil and gas lease."  8–O Williams & Meyers, Oil and Gas Law Scope (2014).  An overriding royalty generally describes a royalty "created from a lease that is in favor of a person other than the lessor of the lease.  An overriding royalty interest is generally created out of the lessee's interest . . . [and is] often created by reservation in an assignment of a lease or by grant or assignment by a working interest owner."  1–2 Williams & Meyers, Oil and Gas Law § 202.3 (2014).

[12] The Williams & Meyers Treatise describes a "working interest" as "[t]he operating interest under an oil and gas lease.  The owner of a working interest has the exclusive right to exploit the minerals on the land; the interest may exist in concurrent ownership with others."  8–W Williams & Meyers, Oil and Gas Law Scope (2014).  By way of example, when "reserving 1/8th royalty, to a lessee who creates no burden on his estate, the working interest consists of 7/8ths of production subject to all costs of exploration and development, [and] the lessor receives his 1/8th production free of such costs.  However, a lessee may transfer out of his working interest and overriding royalty[.]  Id.  The term "working interest" is "generally synonymous with the term 'leasehold interest.'"  Armstrong v. Highlands Operating Co. (In re Great Plains Petroleum, Inc.), 113 B.R. 570, 571, n.1 (Bankr. D.N.D. 1990) (citing Miller v. Schwartz, 354 N.W.2d 685 (N.D. 1984)).

At trial, Preszler testified about the conveyance of the 7/160 Interest.   Preszler
explained that he obtained the original deed of conveyance to Great Plains at the Burke County
Recorder's Office.  See Exs. D–116 and EB–209.  The deed describes Great Plains as the
grantee of seven net mineral acres out of 160 gross acres.  Id.  When Great Plains acquired
these seven net mineral acres, they were subject to an oil and gas lease to a third party under
which the third party was granted the exclusive right to explore for and produce oil and gas on
the property.  Ex. EB–211.  Preszler acknowledged that Great Plains had the right to receive
royalties from the third party who leased the mineral acres.  He also opined that Great Plains
had a "reversionary" interest in the mineral acres that would manifest when the lease to the third
party expired.

Preszler compared the mineral deed with the Trustee's Assignment as part of his
analysis.  Preszler opined that the Trustee's Assignment reflects the transfer of a .005469
overriding royalty interest in the Melvin E. Peterson 1 Well and not a transfer of seven net
mineral acres.  Preszler stated that a transfer of seven net mineral acres would have required a
mineral deed, which the Trustee did not provide.  Based on his research and analysis (which did
not include a full title search), Preszler also opined that Great Plains did not even own an
overriding royalty interest in the Melvin E. Peterson 1 Well[13] and, therefore, suggested ESCO
would have acquired no interest in this property through the Trustee's Assignment.

For trial, Preszler created a map showing that the property description listed in the
Trustee's Assignment also includes the Melvin E. Peterson 2 Well.  See Ex. D–159.  The Melvin
E. Peterson 2 Well was not listed in the Inventory, Notice of Bankruptcy Sale, or the Trustee's
Assignment.  Preszler speculated that because the Inventory, Notice of Bankruptcy Sale, and

_____

[13] ESCO and Basin concede that Great Plains did not own an overriding royalty interest in the
property referred to as 7/160 Interest.  See Doc. 47, at 11 ("Likewise, with respect to the 7/160
Interest and the 31% Interest, anyone reviewing the Inventory, Notice of Sale, and Great Plains'
records would have been able to tell that Great Plains did not own an overriding royalty interest
in the properties.  Again, the heading on the assignment was clearly a mistake.").

Assignment refer to the Melvin E. Peterson 1 Well and not the Melvin E. Peterson 2 Well, the Trustee must have intended only to assign a royalty interest in the first well.

In further support of this theory, Preszler explained how the fractional interest listed in the Assignment is calculated and how the fractional interest listed is consistent with the transfer of a royalty interest. According to Preszler, the Melvin E. Peterson 1 Well was in a spacing unit of 160 acres. To calculate the fractional interest, seven net mineral acres are first divided by 160, the number of acres in the spacing unit. The quotient of 7/160 is then multiplied by the royalty rate. Preszler explained that, at the time of the Trustee's conveyance, almost all oil and gas leases used a 1/8th royalty rate. When 7/160 is multiplied by the 1/8th royalty rate, the result is .005469, which is the fractional interest in the Trustee's Assignment.[14] Further, Preszler pointed out that the use of the term "royalty" in the Appraisers' Report suggests that the appraisers only appraised a fractional royalty interest in the oil and gas produced from a specific well and not the net mineral acres. See Ex. EB–202.

2. The 31% Interest

Like the 7/160 Interest, the Inventory, Notice of Bankruptcy Sale and Assignment describe the 31% Interest in slightly different ways, which ESCO and Basin suggest are mistakes requiring reformation. In the alternative, ESCO and Basin assert that the discrepancies create ambiguities requiring the Court's interpretation.

The Trustee listed the 31% Interest on the same page in the Inventory and Notice of Bankruptcy Sale as the 7/160 Interest and conveyed it in the same Assignment. As with the 7/160 Interest, "Royalty Interest" is the main heading on the page of the Inventory where the 31% Interest is listed. Exs. EB–201 and D–101, at 3. Jestrab's office used "Portal field," "Ruppert" Well and the following legal description to describe the 31% interest: "S1/2;

_____

[14] ESCO and Basin agree with the method of calculating the fractional interest. They state the following in their brief: "the inventory described the 7/160 Interest with a reference to . . . the royalty Great Plains received form the Melvin E. Peterson's production—.005469 (1/8*7/160=.005469)." Doc. 47, at 5.

11

S1/2NE1/4 of Section 34, Township 164N, Range 92 W." Id. The "Net Interest in Production" column on the Inventory reads ".038750." Id.

In the Notice of Bankruptcy Sale, the 31% Interest is listed as Parcel Number 36. Exs. EB–203 and D–102, at 2. The legal description in the Notice of Bankruptcy Sale is substantially the same as the description listed in the Inventory. The interest is described as: "Ruppert-Portal Field, Burke County, North Dakota, S1/2, S1/2NE1/4 Sec. 34–164N–92W." Id. The "Interest" column reads "W.I. .03875." Id.

The Trustee's Assignment of the 31% Interest provides that the Trustee is transferring "the overriding royalty interests described in the exhibit attached hereto and made a part hereof, insofar, but only insofar as said overriding royalty interests are covered thereby." Exs. EB–226 and D–117, at 1. The attachment to the Assignment is titled "Overriding Royalties." A legal description identical to the description of the 31% Interest in the Notice of Bankruptcy Sale is adjacent to Parcel Number 36 on the attachment to the Assignment. Id. at 2. The "Royalty" column contains only a ditto mark, and the "Interest" column reads ".03875." Id.

As noted above, the property descriptions referring to the 31% interest are substantially similar in all three documents. Like the 7/160 Interest analysis, there are several sources of confusion arising from the descriptions of the 31% Interest. First, the Inventory refers to the 31% Interest as a "Net Interest in Production;" the Notice of Bankruptcy Sale refers to it as a "W.I." or working interest; and the Assignment refers to it as an "Interest." Second, the page of the Inventory that lists the 31% Interest is titled "Royalty Interest;" the 31% Interest description on the Notice of Bankruptcy Sale does not refer to a royalty at all; and the Assignment refers to an "Overriding Royalty." Third, Great Plains' records as well as copies of deeds of conveyance to Great Plains show that Great Plains owned 124 net mineral acres in the above-described property, but the property descriptions include more acres than 124 net mineral acres. Exs. D–120 to –122 and EB–220. As a result, the parties dispute whether the Trustee intended to transfer the actual mineral acres, a royalty interest or something else.

12

Great Plains originally obtained its interest in the 31% Interest through two mineral deeds.  See Exs. D–120 and D–121.  The first deed conveyed to Great Plains a 10/400 interest, with a clause clarifying that the Grantor intended to convey ten net mineral acres out of 400 gross acres.  See Ex. D–120.  The second deed conveyed to Great Plains a 120/400 interest, with a clause clarifying that the Grantor intended to convey 120 net mineral acres out of 400 gross acres.  See Ex. D–121.  When the two deeds are analyzed together, it appears that Great Plains originally owned a 130/400 interest.  In 1959, Great Plains conveyed a total of six mineral acres.  See Exs. EB–220 and D–122.  As a result, Great Plains owned a 124/400 interest (which equates to a 31% net interest) in these mineral acres at the time of the sale.

Although it appears that Great Plains owned a 31% Interest in 400 mineral acres, Preszler opined that the Trustee only transferred a .03875 overriding royalty interest in the Ruppert 1 Well and not the 124 net mineral acres actually owned by Great Plains.  According to Preszler, the fractional royalty interest listed for the 31% Interest on the Assignment can be calculated using the same methodology applied for the 7/160 Interest.  Preszler explained that the spacing unit for the Ruppert 1 Well was 160.  Because Great Plains owned 124 net mineral acres out of 400 and the spacing unit was only 160 acres, one must first determine how many mineral acres within the spacing unit Great Plains owned.  Multiplying 31% by the 160 acre spacing unit yields 49.6 net acres within the spacing unit.  The 49.6 net acres are then divided by the entire 160 acre spacing unit (49.6/160) and the quotient is multiplied by the 1/8th royalty rate.  The result is the .03875, the figure listed in the Trustee's Assignment.[15]  Preszler also noted that all but one of the properties identified in the Inventory as "Royalty Interests" contained a fractional interest determined by using the same type of calculation.

---

[15] Like with the fractional calculation for the 7/160 Interest, ESCO and Basin agree with the method of calculating the fractional interest for the 31% Interest.  They state the following in their brief: ".038750 . . . is equal to the royalty of 1/8, multiplied by the interest Great Plains owned, 31% of the 160-acre spacing unit, or 49.6 net acres, and divided by the entire number of acres in the spacing unit, 160 (1/8*49.6/160=.03875)."  Doc. 47, at 5.

To explain his opinions regarding the 31% Interest, Preszler created a map similar to the map he created for the 7/160 Interest. See Ex. D–160. With this map, Preszler suggested that another Ruppert Well was on the same property described in the Trustee's Assignment that was not specifically named in the Assignment. He explained that the decimal interest in the Assignment (.03875) was based on a total of 49.6 net acres, which would have only included the first Ruppert Well.

Preszler further opined that the appraisers only appraised an interest in the Ruppert 1 Well and not in the 124 net mineral acres because the Appraisers' Report only referenced the Ruppert 1 Well. See Ex. EB–202. In support of this proposition, Preszler noted that the Ruppert 2 Well, which was also located on this property, was not mentioned in the Appraisers' Report.

Based on his research and analysis (which did not include a full title search), Preszler also opined that Great Plains did not even own an overriding royalty interest in the Ruppert 1 Well.[16] Because Great Plains did not own an overriding royalty, Preszler suggested that ESCO acquired no interest in this property through the Trustee's Assignment.

ESCO and Basin argue that the Trustee conveyed 124 net mineral acres to them. Consistent with the proposition that the Trustee transferred "an interest" in the Ruppert 1 Well, Mau testified that ESCO holds an interest, and was paid for an interest, in this well.[17]

Preszler conceded that the spacing unit for the Ruppert 1 Well was 160 acres in the southwest quarter of Section 34 and that the property descriptions listed in the Inventory, Notice of Bankruptcy Sale, Trustee's Assignment and Appraisers' Report all describe 400 acres in

---

[16] As with the 31% Interest, ESCO and Basin concede that Great Plains did not own an overriding royalty interest in the property referred to as 31% Interest. See Doc. 47, at 11.

[17] In their post-trial brief, ESCO and Basin argue that they were paid royalties for more than forty years under an oil and gas lease with a third-party. They claim Bob Mau testified to this fact at trial, but the record does not support this proposition. Mau only testified that Basin Minerals has an interest in the Rupport I well and that it has been paid for that interest in that well.

Section 34—i.e., the south half and the south half of the northeast quarter of Section 34.  <u>See</u>

Exs. EB–201 and D–101, at 3; EB–203 and D–102, at 2; EB–226 and D–117, at 2; EB–202, at

6.  Preszler explained, however, that from the property description alone one cannot know that

Great Plains only owned a 124 net mineral acre interest in the described property.  He opined

that one could only know the net mineral acres by considering the decimal interest listed

(.03875) and applying the previously- described formula.

3.      The Fossum Lease

The parties agree, and Great Plains' records show, that Great Plains owned a working

interest in the Fossum Lease.  Gussty Fossum and a third party executed the original Fossum

Lease in the 1940s.  <u>See</u> Ex. EB–219.  This lease conveyed to a third party the exclusive right

to explore for and produce oil and gas in and under the "north half and the southwest quarter of

section twenty-nine; the northeast quarter of section thirty; [and] the south half of section

twenty."  <u>Id.</u>  Although the lease between the third party and Great Plains is not in evidence, the

parties agree that Great Plains subsequently acquired the leasehold interest conveyed by

Gussty Fossum in the original lease.  <u>Id.</u>

The original Fossum Lease refers to three tracts of land in Wiley Field, Bottineau

County, North Dakota.  The Inventory, Notice of Bankruptcy Sale and Assignment refer to five

separate wells, all of which fall within the property descriptions listed in the original lease.  The

documents refer to the various wells as Fossum #1, Fossum #2, Fossum #3, Fossum-FLB #1,

and Fossum-FLB #2.

The Inventory page on which these wells are listed is titled "Working Interest."  Exs. EB–

201 and D–101, at 7–8.  Beginning with the Fossum #1 well in the Inventory, the term "Base

Lease" is followed by a legal description: "S1/2 20; SW1/4; N1/2 29; NE1/4 30–161N–81W."  <u>Id.</u>

at 7.  Immediately below is a line which reads:  "#1 Fossum – SW1/4NE1/4 30–161N–81W."  <u>Id.</u>

To the right, the figure ".57421875" is under a column titled "Great Plains Interest in Gross

Production."  <u>Id.</u>

15

The Notice of Bankruptcy Sale lists the description for this well as "S1/2NE1/4 Sec. 30–161 N., 81 W."  Exs. EB–203 and D–102, at 1.  To the right, there is a column labeled "Interest."  No fractional interest is listed under the "Interest" column or next to the initials "W.I." which appear on the same line as the legal description.  Id.

The Trustee conveyed the interest in the #1 Fossum well to ESCO through an Assignment of Oil and Gas Leases in December of 1969, but later the Trustee issued a Correction Assignment of Oil and Gas Leases in November of 1970.  See Exs. EB–223, EB–224 and D–124.  In the original Assignment, the Trustee listed the Fossum #1 well with the same legal description as that provided in the Notice of Bankruptcy Sale.  See Exs. EB–203 and EB–223.  Unlike the Notice of Bankruptcy Sale, the Assignment includes a reference to the following fractional working interest:  "W.I. .57421875."  EB–223, at 2.  The Correction Assignment is identical to the original Assignment in all respects except for the addition of a new section at the bottom of the document.  The new section is labeled "Leases covered" and provides the following additional information:

(1) Federal Land Bank of Saint Paul dated November 29, 1954 (Description – T161N, R81W, Sec. 29, SW1/4, Bottineau County, North Dakota; and Recording Data – Book 50M Page 363); and
(2) Gusty [sic] Fossum dated April 9, 1949 (Description – T161N, R81W, Sec. 29, SW1/4, Bottineau County, North Dakota; and Recording Data – Book W Page 213).

Exs. EB–224 and D–124, at 2–3.

The Fossum #2 and #3 wells are listed together in the Inventory below the reference to the Fossum #1 well.  Exs. EB–201 and D–101, at 7.  As with the Fossum #1 well, the author typed the term "Base Lease" above Fossum #2–3 followed by a legal description.  This legal description is identical to the "Base Lease" listed for the Fossum #1 well.  Id.  Below, there are two other descriptions listed, which appear to refer to the Fossum #2 and #3 wells, respectively.  They are "(2) NE1/4NE1/4 30–161N–81W" and "(3) SW1/4NW1/4 29–161N–81W."  Id.

16

The Notice of Bankruptcy Sale also lists the Fossum #2 and #3 wells, but it contains different property descriptions than those provided in the Inventory.  Exs. EB–203 and D–102, at 1.  The legal description for the Fossum #2 well is "N1/2NW1/4 Sec. 30–161 N., 81 W" and the "Interest" column reads "W.I. .547885."  Id.  The legal description for the Fossum #3 well is "S1/2NW1/4 Sec. 29–161 N., 81 W," but the "Interest" column is blank.  Id.  Neither the original Assignment nor the Correction Assignment references the Fossum #2 or #3 wells.  See Exs. EB–223, EB–224, and D–124.  The Fossum #2 and #3 wells are listed in the Appraisers' Report, however.  See Ex. EB–202, at 2.

The "#1 & #2 Fossum F.L.B." wells are also listed on the Inventory.  See Exs. EB–201 and D–101, at 8.  The "Base Lease" for these wells is described as "SW1/4 29–161N–81W."  Id.  Two other descriptions are listed on separate lines; they are:  "NE1/4SW1/4 29–161N–81W," referring to the Fossum-FLB #1 well and "SW1/4SW1/4 29–161N–81W," referring to the Fossum-FLB #2 well.  Id.

The Notice of Bankruptcy Sale refers to each of the Fossum-FLB wells with the same legal descriptions that appear in the Inventory.  See Exs. EB–203 and D–102, at 2.

The original Assignment lists both of the Fossum-FLB wells.  See Ex. EB–223, at 2.  The Fossum-FLB #1 well description appears to have been crossed out by hand.  Id.  The Fossum-FLB #2 well is not crossed out and is listed with the same legal description as was listed in the Inventory and Notice of Bankruptcy Sale.  Id.  The Correction Assignment lists both Fossum-FLB wells, but the Fossum-FLB #1 well description is not crossed out.  Exs. EB–224 and D–124, at 2.  As previously stated, the Correction Assignment also lists an additional section titled "Leases covered."  Id. at 2–3.

Preszler testified that the Correction Assignment only affected the Fossum-FLB wells.  To illustrate the issues with the Assignment and subsequent Correction Assignment, Preszler prepared a map to show the locations of the Fossum wells covered by the "Base Lease."  See Ex. D–125.  Preszler explained that the legal descriptions for the Fossum-FLB wells were

17

reversed in the Assignment:  the Fossum-FLB #1 well is actually located in the southwest quarter of the southwest quarter of section 29, and the Fossum-FLB #2 well is actually located in the northeast quarter of the southwest quarter of section 29.  Preszler opined that the "Leases covered" section was likely added as a clarification to correct the mistake with the Fossum-FLB wells.

Preszler also explained that all of the Fossum wells are located within the broad "Base Lease" legal description.  Preszler opined that an assignment of the entire lease would not necessarily have to list specific wells, but a proper assignment of the entire lease requires more than a reference to only three of the wells.  Preszler further opined that the Trustee conveyed only a share of the production corresponding to the decimal interest listed on the Assignment and Correction Assignment in the Fossum #1, Fossum-FLB #1, and Fossum-FLB #2 wells.

4.    The 55/240 Interest

Great Plains acquired the 55/240 Interest in 1958 and 1959 via three separate mineral deeds.  In August 1958, Allen Linderman conveyed to Great Plains a 10/240 interest in the oil, gas and minerals in and under the south half of the northwest quarter and the southwest quarter of Section 15, Township 163, Range 95 in Divide County, North Dakota.[18]  Great Plains also acquired an interest with two other mineral deeds covering the same property, one for a 15/240 interest[19] and another for a 30/240 interest.[20]  Preszler testified that his research revealed that Great Plains owned a 55/240 interest at the time of its bankruptcy.

The property description for the 55/240 Interest listed in the Inventory is "S1/2NW1/4; SW1/4–15–163–95."  Exs. EB–201 and D–101, at 19.  Adjacent to the description, the "Interest" listed is "55/320."  Id.  A separate column lists the net acres as "55.00" out of "320" gross acres. Id.  The legal descriptions in the Notice of Bankruptcy Sale and Inventory are identical.  Exs.

---

[18] See Exs. EB–215, at 2 and D–131, at 1.

[19] See Exs. EB–215, at 1 and D–131, at 2.

[20] See Exs. EB–215 and D–131, at 3.

EB–201 and D–101, at 19; EB–203 and D–102, at 1.  The 55/240 Interest corresponds with
Parcel Number 56 in the Notice of Bankruptcy Sale, and the interest listed for sale is "55–320."
Exs. EB–203 and D–102, at 1.  The Trustee's Assignment contains a legal description identical
to the description in the Notice of Bankruptcy Sale and in the Inventory.  The Trustee's
Assignment reflects a conveyance of a "55/320" interest.  <u>See</u> Ex. EB–216, at 4.

     Preszler opined that the Assignment of a 55/320 interest conveyed less than Great
Plains actually owned.  Preszler explained that the net mineral acres owned by Great Plains
may be calculated by multiplying the fractional interest by gross acres.  In other words, by
multiplying 55/240 (the interest Great Plains actually owned) by 240 gross acres reveals that
that Great Plains owned 55 net mineral acres.  Preszler explained that when the 55/320 interest
that the Trustee conveyed is multiplied by 240, the result is only 41.25 mineral acres.
Therefore, Preszler opined that the Trustee conveyed only 41.25 of the 55 mineral acres
actually owned by Great Plains, leaving the bankruptcy estate with 13.75 mineral acres.

     5.     The 60/320 Interest

     In July 1959, Harry Berg conveyed to Great Plains a 60/160 interest in the oil, gas and
minerals in and under the northwest quarter of Section 27 and the southwest quarter of Section
22, Township 163 North, Range 95 West in Divide County, North Dakota.  <u>See</u> Ex. EB–214.  In
the Inventory, this interest is described as "NW1/4–27; SW1/4–22–163–95."  Exs. EB–201 and
D–101, at 20.  The "Interest" is 60/160.  <u>Id.</u>  A separate column lists the net acres as "60.00" out
of "160" gross acres.  <u>Id.</u>  The legal descriptions in the Notice of Bankruptcy Sale and Inventory
are identical.  <u>See</u> Exs. EB–203 and D–102, at 2.  The interest included in the Notice of
Bankruptcy Sale is also "60–160."  <u>Id.</u>  This mineral interest is listed as Parcel Number 66 in the
Notice of Bankruptcy Sale, and the interest listed for sale was "60–160."  <u>Id.</u>  The Trustee's
Assignment contains a legal description identical to the description in the Notice of Bankruptcy
Sale and the Inventory, and it reflects a conveyance of a "60/160" interest.  <u>See</u> Ex. EB–216, at
4.

Preszler testified that the Trustee's Assignment reflects an over-conveyance because Great Plains owned less than a 60/160 interest.  Throughout this proceeding, ESCO and Basin claimed that the Trustee should have conveyed a 60/320 interest.  Similarly, Preszler testified that the conveyance should have listed the gross acres as 320 acres, not 160 acres.  Because there were actually 320 gross acres, a conveyance of a 60/160 interest conveyed a total of 120 net acres when Great Plains only owned 60 net mineral acres.  Thus, Preszler opined that the Trustee conveyed more than what Great Plains actually owned.  Great Plains conceded this point in its post-trial brief when it stated: "Consequently, there are no net mineral acres remaining that Great Plains owns and Plaintiff concedes any right, title, or interest to this property."  Doc. 46, at 21.

## II.   CONCLUSIONS OF LAW

### A.   Motion to Amend Counterclaim

At the conclusion of trial, ESCO and Basin moved to amend their Counterclaim to include claims for reformation.  Rule 15 of the Federal Rules of Civil Procedure is made applicable in bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7015.  Rule 15 provides:

> If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended.  The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits.

Fed. R. Civ. P. 15(b)(1).  "A motion to amend to conform may be made at any time."  Pummill v. Greensfelder (In re Richards & Conover Steel Co.), 267 B.R. 602, 610 (B.A.P. 8th Cir. 2001) (citing Kim v. Nash Finch Co., 123 F.3d 1046, 1062 (8th Cir. 1997)).  Further, the "intent of the rule is 'to provide maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'"  In re Richards & Conover Steel Co., 267 B.R. at 610 (quoting Hardin v. Manitowoc-Forsythe Corp., 691 F.2d 449, 456 (10th Cir. 1982)).

Great Plains opposed the motion to amend, asserting that the motion was untimely and not supported by the evidence. Great Plains failed to articulate a basis for its claim that the motion was untimely, and the Court finds none. Although ESCO and Basin did not plead the elements of a reformation claim or include the term "reformation" in their Counterclaim, they requested the Court to "direct the trustee to issue corrective assignments or other conveyances of the Disputed Assets," in their prayer for relief. Consequently, Great Plains was aware that ESCO and Basin were seeking reformation of the Assignments as a remedy. Further, Great Plains articulated no prejudice resulting from the proposed amendment. Accordingly, the Court finds that Great Plains failed to satisfy the Court that either the proposed amendment or the evidence offered in support of reformation claims would prejudice Great Plains' action. The Court also finds that permitting ESCO and Basin to amend their Counterclaim to add claims for reformation will aid in presenting the merits of the claims and causes of action before the Court. Therefore, IT IS ORDERED that ESCO and Basin's motion to amend their complaint to include claims for reformation is GRANTED.

**B.     Consideration of Extrinsic Evidence**

Throughout this litigation, the parties repeatedly argued about whether the parol evidence rule is applicable in this case. ESCO and Basin claim that this case involves a mutual mistake and that the conveyance documents are ambiguous. They request the Court to consider parol evidence to resolve the mistakes and ambiguities. Great Plains argues that parol evidence should not be considered.

Although courts often discuss the "admissibility" of parol evidence, it is important to note that the "parol-evidence rule is not a rule of evidence, but rather one of substantive law." Radspinner v. Charlesworth, 369 N.W.2d 109, 112 (N.D. 1985) (citing (Ell v. Ell, 295 N.W.2d 143 (N.D. 1980); Gajewski v. Bratcher, 221 N.W.2d 614 (N.D. 1974)). The North Dakota Supreme Court explained the parol evidence rule as follows:

21

> The parol evidence rule is a rule of substantive law and precludes use of evidence of prior oral negotiations and agreements to vary the terms expressed in a written contract. See Citizens State Bank–Midwest v. Symington, 2010 ND 56, ¶ 19, 780 N.W.2d 676; Des Lacs Valley Land Corp. v. Herzig, 2001 ND 17, ¶ 7, 621 N.W.2d 860.  The parol evidence rule is codified in N.D.C.C. § 9–06–07, which provides that "[t]he execution of a contract in writing, whether the law requires it to be written or not, supercedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."  A court may consider parol evidence when a written agreement is ambiguous, or when the written agreement does not reflect the parties' intent because of fraud, mistake, or accident.

Myaer v. Nodak Mut. Ins. Co., 2012 ND 21, ¶ 20, 812 N.W.2d 345, 353.  The

North Dakota Supreme Court further explained:

> Where parties, *without any fraud or mistake*, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. . . . [A]ll preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and *unless fraud, accident, or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence.*

Golden Eye Res., LLC v. Ganske, 2014 ND 179, ¶ 17, 853 N.W.2d 544, 551 (emphasis original)

(quoting Citizens State Bank–Midwest, 2010 ND at ¶ 19, 780 N.W.2d at 685) (internal quotation

marks omitted).

Even though the parties argued at length over ambiguity and mistake, neither asserted

that "prior oral negotiations and agreements" occurred or argued that the Court should consider

them to alter the terms of the conveyances.  For example, no party argued that the Trustee and

Schwartz spoke in detail about property descriptions or the bankruptcy estate's interest in a

certain oil well or mineral interest, negotiated terms of transfer or reached an oral understanding

regarding the purchase of Great Plains' interests in one or more of the Disputed Assets.

Rather, the heart of the dispute relates to what interests the Assignments conveyed and

whether the conveyances properly executed the Trustee's intent.  Therefore, the Court finds that

the parol evidence rule is not applicable in this case.  See Spitzer v. Bartelson, 2009 ND 179, ¶

14, 773 N.W.2d 798, 803 ("The nature of a reformation action is such that it is outside the field

of operation of the parol evidence rule, since the court does not receive parol testimony to vary

the contract of the parties but to show what their contract really was.")  (internal quotation and citation omitted).

Although the Court finds that the parol evidence rule is not applicable in this case, this conclusion does not mean that the Court declines to consider extrinsic evidence under other legal theories, such as reformation or contract interpretation, which allow the Court to rewrite or clarify the conveyance documents.  The Court merely concludes that, as a matter of substantive law, no evidence of "prior oral negotiations and agreements" was offered or will be considered in deciding whether to alter the terms of the conveyance documents.

### C.    Statute of Limitations

Great Plains argues that ESCO and Basin's reformation claims are barred by two statutes of limitations.  It alleges that the following statutes of limitations are relevant:

> The following actions must be commenced within ten years after the claim for relief has accrued:
>
> \* \* \*
>
> 2. An action upon a contract contained in any conveyance or mortgage of or instrument affecting the title to real property except a covenant of warranty, an action upon which must be commenced within ten years after the final decision against the title of the covenantor[.]

N.D.C.C. § 28–01–15.

> The following actions must be commenced within six years after the claim for relief has accrued:
> 1. An action upon a contract, obligation, or liability, express or implied, subject to the provisions of sections 28–01–15 and 41–02–104[.]

N.D.C.C. § 28–01–16.

Under North Dakota law, "a reformation action accrues, or comes into existence as a legally enforceable right, not at the time the instrument in question is executed, but at the time the facts which constitute the mistake and form the basis for reformation have been, or in the exercise of reasonable diligence should have been discovered by the party applying for relief."

Johnson v. Hovland, 2011 ND 64, ¶ 13, 795 N.W.2d 294, 299 (citing Ell, 295 N.W.2d at 151–52 (N.D. 1980); Wehner v. Schroeder, 335 N.W.2d 563, 567 (N.D. 1983)).  "When a cause of

action has accrued for purposes of applying a statute of limitations generally involves a question of fact" unless the facts are undisputed in which case the issue of whether a statute of limitations has run "is a question of law for the court."  Hovland, 2011 ND 64, ¶ 13, 795 N.W.2d at 299–300.  "Generally, a defense based on the statute of limitations in a civil proceeding is an affirmative defense, and the party relying on the statute of limitations has the burden of proving the action is barred."  D.E. v. K.F., 2012 ND 253, ¶ 11, 825 N.W.2d 832, 835 (2012) (citing Interest of K.B., 490 N.W.2d 715, 717 (N.D. 1992); McCarter v. Pomeroy, 466 N.W.2d 562, 566 (N.D. 1991)).

Great Plains argues that ESCO and Basin's reformation claims accrued when Schwartz purchased the property from the Trustee, asserting that a reasonably prudent person who purchases mineral and royalty interests should take steps to examine title when they acquire information suggesting problems.  Specifically, Great Plains argues that ESCO and Basin were put on notice of title problems by January 19,1969, when Schwartz received the instruments of conveyance and the Notice of Bankruptcy Sale that show the inconsistencies raised by the parties in this litigation, including: (1) the reference to overriding royalty interest in the Assignment of the 7/160 Interest and the 31% Interest; (2) the omission of wells in descriptions of the Fossum Lease; and (3) the Assignment of only a 55/320 Interest, when Great Plains owned a 55/240 interest in Parcel 56, Divide County, North Dakota.  Great Plains also suggests it is "reasonable to find" that ESCO and Basin possessed Great Plains' records of its interests— referring to the records discovered during this litigation.  See supra note 1.  It argues that a reasonable and prudent person would have compared these records to the Trustee's conveyances and discovered the title problems.

Great Plains also asserts that ESCO and Basin were on notice of facts sufficient to trigger accrual of the statutes of limitations 20 to 25 years ago when Mau first learned of some title issues with assets purchased from the Trustee at the bankruptcy auction sale and traveled to the Bankruptcy Court in Fargo to look at the Great Plains bankruptcy file.  At or about this

time, Mau became aware of the Amended Order confirming the sale of the assets, which Great Plains asserts should have caused a prudent person to closely examine the conveyances to ensure good title.

The Court is not persuaded by these arguments. Under North Dakota law, Great Plains must show that ESCO and Basin received facts showing the alleged mistakes and forming the basis of their reformation claims. In other words, it must show ESCO and Basin received information about the specific Disputed Assets sufficient to put them on notice (or in the exercise of reasonable diligence would have put them on notice) that there were mistakes in the Assignments. Great Plains has not met this burden.

First, the Trustee testified that he did not recognize Great Plains' records of its property interests, and there is no evidence that they were available to him or that he gave them to Schwartz. There is no evidence that the records stored in the basement of an office used by a company affiliated with ESCO and Basin were available to the people Great Plains suggests had the duty to inspect them at any time prior to December 20, 2003 (the date after which accrual of a reformation cause of action would not be barred by N.D.C.C. § 28–01–15). There is no evidence that the records were available to ESCO and Basin before Greenberg discovered them. There is no evidence of when the records were transferred to the affiliated company's space or who transferred them. Further, there is no evidence of when Greenberg discovered the records.

Second, Great Plains cites no statutes or cases standing for the proposition that Schwartz or Mau had a duty to inspect or compare the Notice of Bankruptcy Sale, title records and conveyances to ensure that ESCO and Basin acquired clear title to the interests transferred by the Trustee, or that breach of such a duty would trigger the accrual of the statute of limitations. Great Plains has not established that a reasonable purchaser of oil and gas interests would have incurred the expense of thorough title examinations or otherwise spend the

25

time comparing the conveyances with the Notice of Bankruptcy Sale and other records available to ensure clear title to the Disputed Assets—without knowledge of specific title problems.

Further, Great Plains offered no evidence that ESCO and Basin were aware of specific title issues relating to any Disputed Asset 20 to 25 years before they alleged reformation claims.[21]  Schwartz/ESCO purchased many assets at the bankruptcy sale.  General knowledge of some title problems is not an admission that ESCO and Basin knew or, in the exercise of reasonable diligence, should have known of title discrepancies related to the Disputed Assets. Mau's vague statement that he was aware of some title issues, without any information about the extent of the title issues or which interests were involved, is not sufficient to show notice. Without more, Great Plains did not meet its burden of proving that ESCO and Basin's reformation claims accrued 20 to 25 years ago.

Third, Mau's discovery of the Orders confirming sale 20 or 25 years ago is not sufficient—without evidence that Mau was researching a title discrepancy related to a Disputed Asset—to put ESCO and Basin on notice of the mistakes they seek to correct with reformation today.  To the contrary, the Orders entered by the Referee in Bankruptcy confirming the sale of "all the assets of the bankrupt corporation included in the Notice of Sale to Earl Schwartz" may have assuaged the concerns that Great Plains argues were obvious.  Exs. EB–206 and D–104, at 1.  For example, even though the Assignment did not reference the Fossum #2 and #3 wells, both wells were included in the Notice of Bankruptcy Sale.  The Order confirming sale provides that all the assets listed in the Notice of Bankruptcy Sale were sold to Schwartz, arguably deterring Schwartz from trying to remedy the discrepancy if he had discovered it.  The inconsistencies or discrepancies with the other Disputed Assets were even less obvious,

---

[21] ESCO and Basin assert that handwritten notations on a document that appears to be a notice of sale suggest Schwartz had knowledge regarding the nature of the 7/160 Interest and 31% Interest.  Doc. 47, at 7.  The notations show certain interests were recorded and certain documents were ordered and signed, but the Court received no evidence of why Schwartz made the notations or when they were made.  The notations do not show that Schwartz was aware of title issues related to the 7/160 Interest or the 31% Interest.

requiring substantial research and title work to uncover the nature and extent of Great Plains'

interests in the Disputed Assets at the time of the bankruptcy—as Preszler made clear in his

testimony.  Consequently, the Court rejects Great Plains' argument that ESCO and Basin's

reformation claims accrued in 1969 when Schwartz received the documents of conveyance, or

20 to 25 years ago when Mau learned of some title issues and obtained a copy of the Order

confirming the sale.

Next, Great Plains argues that ESCO and Basin's claim seeking reformation of the

Fossum Lease conveyance accrued when Mau signed the 1997 unitization agreement.  The

unitization agreement listed 23 mineral and working interest owners, including ESCO and Great

Plains, who held interests in the northwest quarter of the northwest quarter of Section 29.  It

also listed nine entities in addition to Great Plains and ESCO, who held a royalty interest in the

southwest quarter of the northeast quarter of Section 29.  The legal description in the unitization

agreement overlaps with the legal descriptions included in the Fossum Lease.  Specifically, the

property described in the unitization agreement (which includes Great Plains' interests) overlaps

with the property description given for the "Base Lease" in the Inventory, but it does not overlap

with any of the property descriptions listed for the Fossum wells on either the Notice of

Bankruptcy Sale or in the Assignment or Correction Assignment.  See Ex. D–125.

The Court received little evidence about the unitization process, other than Preszler's

testimony that a unit operator applies to the North Dakota Industrial Commission, waits for

approval and then seeks ratification from a certain percentage of the owners.  Based on

evidence received, it appears that a third party created the unitization agreement and listed

Great Plains as a royalty owner.  A third party's assertion that Great Plains owned a royalty

interest in this property is insufficient to trigger the accrual of ESCO and Basin's claim,

especially since there is no evidence regarding the reliability of this information.  The Court

received no evidence about the third party's basis for including Great Plains as a royalty owner

nearly 30 years after the bankruptcy proceeding.  There is no evidence that the third party

preparer of the unitization agreement ran a title search or relied on a title opinion as a basis for including Great Plains as a royalty interest owner.  Further, there is no evidence of when or from whom Great Plains acquired the interest listed in the unitization agreement.

Also, the Court finds that Mau's testimony about the extent of his review of the unitization agreement was credible. Mau testified that he reviewed the agreement to ensure ESCO's interests were protected and did not pay attention to whether Great Plains was listed as an owner because he "did not represent them."  Based on the evidence, it does not appear that he reviewed the agreement to determine whether other royalty or interest owners were infringing on ESCO's property rights, but rather to determine whether it was in ESCO's best interest for all or some part of the producing reservoir on this land to be operated as a single entity as proposed in the unitization agreement.  Accordingly, the Court finds that ESCO and Basin's receipt of the unitization agreement did not put them on notice of the dispute related to the Fossum Lease alleged in this case.

Great Plains also argues that ESCO and Basin's reformation cause of action seeking to rewrite the Fossum Lease conveyance accrued in 2004.  ESCO and Basin admit that they became aware of specific title issues with the Fossum Lease on or about March 29, 2004.[22] See Ex. D–129; Doc. 47, at 15 (ESCO and Basin "learned of issues with the Fossum Lease following title work in 2004 (D–129)").  Based on their admission and other evidence received, the Court finds that the reformation claim pertaining to the Fossum Lease conveyance accrued on March 29, 2004.

Great Plains argues that two North Dakota statutes of limitations apply to the reformation claims:  Section 28–01–15 providing that actions upon a contract contained in any conveyance

---

[22] Great Plains argues that ESCO and Basin attempted to convince operators to "improperly pay royalty and working interest payments" with regard to the Disputed Assets.  Doc. 46, at 23. Specifically, it claims ESCO and Basin attempted to sell the entire Fossum Lease to another company in 2004.  Id.  Great Plains lists other "examples" of allegedly improper attempts to claim the assets, but does not explain what conduct was improper or why this claim is relevant to the issues before the Court.  Id.

or instrument affecting title to real property must be commenced within ten years after the claim

accrued, and section 28–01–16 providing that an action upon a contract must be commenced

within six years after the claim accrued.

"Generally, the longer statute of limitations governs if there is a question about

applicability." Locken v. Locken, 2011 ND 90, ¶ 17, 797 N.W.2d 301, 307–08 (citing Burr v.

Kulas, 1997 ND 98, ¶ 12, 564 N.W.2d 631, 635); see also Global Fin. Servs., Inc., 1998 ND 53,

¶ 20, 575 N.W.2d at 671 ("[W]e have a general policy of selecting the longer statute of

limitations when there is a reasonable dispute over which statute applies."). Consistent with this

principle, the Court finds that the ten year statute of limitations under section 28–01–15 applies

in this case.

The parties agree, and Great Plains' records show, that Great Plains owned a working

interest in the Fossum Lease. Section 28–01–15 specifically applies to those actions "upon a

contract contained in any conveyance or mortgage of or instrument affecting the title to real

property[.]" N.D.C.C. § 28–01–15. "Oil and gas leases are interests in real property in North

Dakota." Nantt v. Puckett Energy Co., 382 N.W.2d 655, 659 (N.D. 1986); see also (Miller v.

Schwartz, 354 N.W.2d 685, 689 (N.D. 1984) ("The interest acquired by the lessee under an

ordinary oil and gas lease is known as a working interest and is an interest in real property."

(internal quotation and citation omitted)). Since the reformation claim related to the Fossum

Lease conveyance is an action affecting title to real property, the enforceability of the claim is

determined by Section 28–02–15 of the North Dakota Century Code, which bars claims that

accrue more than ten years before the cause of action was filed. The Court finds that section

28–01–16, which applies to other contract causes of action, is not applicable to the reformation

of the Fossum Lease conveyance.

ESCO and Basin filed their Counterclaim on December 20, 2013, less than 10 years

after their claims accrued in March 2004. Consequently, their cause of action seeking

reformation of the Fossum Lease conveyance is not barred by section 28–01–15.

29

Likewise, ESCO and Basin's causes of action seeking reformation of the 7/160 Interest and the 31% Interest conveyances are not barred by the statutes of limitations cited by Great Plains.  On or about January 11, 2010, ESCO and Basin received a title opinion advising them of a title discrepancy with the 7/160 Interest.  See Exs. D–118 and EB–234.  At trial, Greenberg testified that, prior to receiving this title opinion, he had no knowledge of any discrepancy with the title to the 7/160 Interest.  ESCO and Basin received notice of title issues relating to the 31% Interest on or about March 20, 2013.  Ex. D–123.  Mau testified that he had not been alerted to any other issues with the 31% Interest before March 2013.  There is no evidence that ESCO and Basin were on notice of the specific mistakes or discrepancies with these interests before they received these title opinions.  Assuming that these title opinions were sufficient to trigger accrual of ESCO and Basin's claims, ESCO and Basin learned of them well within the ten-year and six-year statutes of limitations cited by Great Plains.  Great Plains' affirmative defense is rejected.  ESCO and Basin's reformation claims are not barred by the statutes of limitations.

**D.   Merits of the Claims**

ESCO and Basin argue that the conveyance documents executed by the Trustee are ambiguous and that they are the result of mistakes made by the Trustee and Schwartz. Conversely, Great Plains argues that the conveyance documents are clear and unambiguous and that there is insufficient evidence of mistake for the Court to alter the documents.

1.   Reformation Principles

 "When, through fraud or mutual mistake of the parties, or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved so as to express that intention so far as it can be done without prejudice to rights acquired by third persons in good faith and for value."  N.D.C.C. § 32–04–17; see also Hovland, 2011 ND 64, ¶ 11, 795 N.W.2d at 298.  "Reformation is an equitable remedy used to rewrite a contract to accurately reflect the parties' intended agreement."  Id.  Applying principles of equity, North Dakota courts will grant

30

remedial relief in the nature of reformation of a written instrument resulting from a mutual mistake, "when justice and conscience so dictate." Id. (internal quotations omitted).

In cases where a party pleads claims for reformation, "a presumption arises from the terms of the instrument that it correctly expresses the true agreement and intention of the parties." Ell, 295 N.W.2d at 150. Therefore, before such remedial relief will be granted, "both parties must be mistaken about the legal effect of the language used in the contract and both parties must make substantially the same mistake as to the law; otherwise, reformation of the contract would impose a contract that the parties did not agree upon." In re Matthew Larson Trust Agreement Dated May 1, 1996, 2013 ND 85, ¶ 15, 831 N.W.2d 388, 394. "Whether a contract contains a mistake sufficient to support a reformation claim is a question of fact." Hovland, 2011 ND 64, ¶ 11, 795 N.W.2d at 299.

"In reformation actions, courts can properly look into the surrounding circumstances and take into consideration *all* facts which disclose the intention of the parties. Any evidence that tends to show the true intention of the parties, whether it be evidence of conduct or declarations of the parties extrinsic to the contract or documentary evidence, is admissible." Spitzer, 2009 ND 179, ¶ 15, 773 N.W.2d at 803 (internal quotations omitted). The burden of proof is on the party seeking reformation of a written document, who must establish, by clear and convincing evidence, that the document does not state the parties' intended agreement. Hovland, 2011 ND 64, ¶ 12, 795 N.W.2d at 299. "Courts grant the high remedy of reformation only upon the certainty of error." Id. (internal quotations omitted).

2.      Contract Interpretation Principles

"Documents that convey oil and gas interests are subject to the same general rules that govern interpretation of contracts." Minex Resources, Inc. v. Morland, 467 N.W.2d 691, 696 (N.D. 1991) (citing Miller, 354 N.W.2d at 688). "The interpretation of assignments, like the interpretation of contract terms generally, is a question of the intent of the parties and is typically a question of fact for the trier of fact. . . . However, where an assignment is memorialized in a

31

clear and unambiguous writing, a court should not look to extrinsic evidence to ascertain intent."
Golden v. SM Energy Co., 2013 ND 17, ¶ 11, 826 N.W.2d 610, 616 (citations omitted).

Whether a contract is ambiguous is a question of law.  Bakken v. Duchscher, 2013 ND
33, ¶ 13, 827 N.W.2d 17, 21 (citing Myaer, 2012 ND 21, ¶ 10, 812 N.W.2d at 350).  "A contract
is ambiguous when rational arguments can be made for different interpretations."  Golden, 2013
ND 17, ¶ 11, 826 N.W.2d at 616 (citing Nichols v. Goughnour, 2012 ND 178, ¶ 12, 820 N.W.2d
740, 744).  Further, "[i]f a contract is ambiguous, extrinsic evidence may be considered to clarify
the parties' intentions."  Id. (citing Gawryluk v. Poynter, 2002 ND 205, ¶ 9, 654 N.W.2d 400,
403–04).  Stated another way, "[a] determination of ambiguity is but the starting point in the
search for the parties' ambiguously expressed intentions, since an ambiguity creates a question
of fact to be determined with the aid of extrinsic evidence."  Moen v. Meidinger, 547 N.W.2d
544, 547 (N.D. 1996) (internal quotation marks and citation omitted).

3.        The 7/160 and 31% Interests

As noted above, the property descriptions on the Inventory, Notice of Bankruptcy Sale,
and Assignment defining the 7/160 Interest are substantially the same, but there are three
sources of confusion.  The same is true for the 31% Interest.  Specifically, the legal descriptions
are nearly identical, but the same sources of confusion appear.  First, the Inventory refers to the
7/160 Interest and 31% Interest as a "Net Interest in Production," the Notice of Bankruptcy Sale
refers to them as a "W.I." or working interest, and the Assignment refers to them as an
"Interest."  Second, the Inventory page on which both the 7/160 Interest and the 31% Interest
appear is titled "Royalty Interest," the Notice of Bankruptcy Sale also refers to a "Royalty," but
the Assignment refers to an "Overriding Royalty."  Finally, Great Plains' records as well as a
copy of the deed of conveyance to Great Plains show that Great Plains owned net mineral acres
in the real property described.

Great Plains argues that the Trustee conveyed an overriding royalty interest, which
Great Plains never owned.  Consequently, it claims the Assignment conveyed nothing.  ESCO

and Basin assert that the Trustee intended to transfer net mineral acres, as opposed to merely a

royalty interest in the oil and gas produced from a specific well.  They request the Court to

declare they own the mineral acres.  In the alternative, ESCO and Basin argue that, at the very

least, the Trustee intended to convey a royalty interest to ESCO.

> a.   Alleged mistakes or ambiguities regarding whether the Trustee
> transferred a royalty interest or the net mineral acres in the 7/160
> Interest.

The evidence shows that Great Plains acquired seven mineral acres located at NW1/4 of

8–159N–94W, Burke County, North Dakota, from Harry Berg in August 1958.  When Great

Plains acquired these seven net mineral acres, they were subject to an oil and gas lease to a

third party under which the third party was granted the exclusive right to explore for and produce

oil and gas in the property.  Ex. EB–211.  Great Plains' records, which were discovered during

this litigation, also show that it owned seven net mineral acres as of August 1958.[23]

To meet their burden of proving their reformation claim, ESCO and Basin must show a

mutual mistake in the conveyance of the 7/160 Interest.  ESCO and Basin did not show that the

Trustee knew that Great Plains owned seven net mineral acres and intended to transfer it.

Rather, the relevant documents show the Trustee transferred a .005469 royalty interest in the

Melvin E. Peterson 1 Well, and there is no evidence suggesting that this was the result of a

mutual mistake.

Specifically, the evidence shows that the Great Plains' records were "a mess," and the

Trustee concluded that the expense of securing title opinions regarding all the property was cost

prohibitive.  Although the Trustee intended to list for sale all of Great Plains' assets he identified

and to sell all of Great Plains' interests in the assets, he was not confident that all of Great

Plains' assets were identified, listed and sold.  At the time of trial, the Trustee could not recall

---

[23] The Trustee testified that he did not recall seeing Great Plains' records of its assets.
Therefore, the Court will not rely on these records as evidence of what the Trustee knew about
Great Plains' assets or what he intended to convey.

his understanding of the nature of Great Plains' interest in the assets when the Notice of

Bankruptcy Sale was prepared or the auction occurred.

The evidence received at trial also shows that, to transfer seven net mineral acres, the

Trustee would have had to issue a mineral deed.  ESCO and Basin offered no evidence of such

a deed, and Preszler found no mineral deed for this property issued by the Trustee when he

performed his research.

The descriptions of the 7/160 Interest in the Inventory, Notice of Bankruptcy Sale and

Assignment all suggest the Trustee intended to transfer a royalty interest.  The Inventory

reference to the 7/160 Interest includes the figure ".005469" in a column with a heading titled

"Net Interest in Production." The Notice of Bankruptcy Sale contains a property description

similar to the Inventory for this interest.  Under a column titled "Interest" appears the word

"Royalty," below which "W.I. .005469" is listed.  The attachment to the Trustee's Assignment of

the 7/160 Interest includes the same legal description as in the Notice of Bankruptcy Sale.  The

attachment also contains a "Royalty" column.  A column with the heading "Interest" reads

".005469."

Preszler offered his opinions regarding how the ".005469" interest was calculated.

Preszler began by assuming the Trustee intended to transfer an interest in the Melvin E.

Peterson 1 Well but not the Melvin E. Peterson 2 Well.  The property description in the

Assignment includes both wells, but the Melvin E. Peterson 2 Well was not listed in the

Inventory, Notice of Bankruptcy Sale or the Trustee's Assignment.  According to Preszler, the

Melvin E. Peterson 1 Well was in a spacing unit of 160 acres, which is consistent with the

fractional royalty interest calculation.

To calculate the fractional interest, the seven net mineral acres are divided by 160,

representing the number of acres in the spacing unit.  The quotient of 7/160 is then multiplied by

the royalty rate.  According to Preszler, at the time of the Trustee's conveyance, almost all oil

34

and gas leases used a 1/8th royalty rate.  When 7/160 is multiplied by the 1/8th royalty rate, the result is .005469, which is the fractional interest referenced in the Trustee's Assignment.

ESCO and Basin do not dispute Preszler's method of calculating the fractional royalty interest.  Further, they concede that .005469 is the royalty interest Great Plains received from the Melvin E. Peterson well.  Specifically, they state: "the inventory described the 7/160 Interest with a reference to . . . the royalty Great Plains received form the Melvin E. Peterson's production—.005469 (1/8*7/160=.005469)."  Doc. 47, at 5.

In addition to the royalty interests referenced in the Inventory, Notice of Bankruptcy Sale and Assignment, the Appraisers' Report supports the proposition that the Trustee intended to transfer only a royalty interest.  Specifically, the use of the term "royalty" in the Appraisers' Report suggests that the appraisers only appraised a fractional royalty interest in the oil and gas produced from a specific well and not the net mineral acres.  See Ex. EB–202, at 6.

For reformation to be granted, the Court must be satisfied that the Trustee understood the nature of Great Plains' interests in the described property and intended to convey them, but mistakenly used the wrong words to do so.  See In re Matthew Larson Trust, 2013 ND 85, ¶ 15, 831 N.W.2d at 394; see also Arndt v. Maki, 2012 ND 55, ¶ 12, 813 N.W.2d 564, 569 ("A mutual mistake that will justify reformation requires that, at the time of the execution of the agreement, both parties intended to say something different from what was said in the document." (internal quotation omitted)).  The references to the fractional interest, which required the Trustee to include the standard royalty rate in his calculation, together with the use of the term "royalty" in the descriptions or headings suggest the Trustee was aware that Great Plains owned a royalty interest and intended to transfer it.  More importantly, there is no evidence that the transfer of a fractional royalty interest was an error or that the Trustee actually intended to transfer seven net mineral acres but mistakenly used the wrong words.  ESCO and Basin's request that the Court declare they are entitled to the seven mineral acres and reform the conveyance accordingly is denied.

35

        b.      Alleged mistakes or ambiguities regarding whether the Trustee transferred a royalty interest or the net mineral acres in the 31% Interest.

The same is true for the 31% Interest.  The evidence shows that Great Plains acquired 124/400 net mineral acres located at S1/2, S1/2NE1/4 34–164N–92W, Burke County, North Dakota, through mineral deeds filed prior to the bankruptcy sale.  Great Plains' records also show that it owned 124/400 net mineral acres.  As with the 7/160 Interest, ESCO and Basin did not show that the Trustee knew that Great Plains owned 124/400 net mineral acres and intended to transfer them.  Rather, the relevant documents show the Trustee transferred a .03875 royalty interest in oil and gas produced from the Ruppert 1 Well and there is no evidence suggesting that this was the result of a mutual mistake.

As noted above, the Trustee was not confident that all of Great Plains' assets were listed on the Notice of Bankruptcy Sale and sold at the auction.  The evidence also shows that, to transfer net mineral acres, the Trustee would have had to issue a mineral deed.  ESCO and Basin offered no evidence of a mineral deed from the Trustee to a third party and Preszler found no mineral deed for this property issued by the Trustee when he performed his research.

The descriptions of the 31% Interest in the Inventory, Notice of Bankruptcy Sale and Assignment all suggest the Trustee intended to transfer a royalty interest.  The Inventory reference to the 31% Interest includes the figure ".038750" in a column with a heading titled "Net Interest in Production." The Notice of Bankruptcy Sale contains a property description similar to the Inventory for this interest.  Under a column titled "Interest" appears the word "Royalty," below which "W.I. .03875" is listed.  The attachment to the Trustee's Assignment of the 31% Interest includes the same legal description as in the Notice of Bankruptcy Sale.  The attachment also contains a "Royalty" column.  A column with the heading "Interest" reads ".03875."

According to Preszler, the fractional interest listed for the 31% Interest on the Assignment can be calculated using the same methodology applied for the 7/160 Interest.

Preszler explained that the spacing unit for the Ruppert 1 Well was 160.  Because Great Plains

owned 124 net mineral acres out of 400 and the spacing unit was only 160 acres, one must first

determine how many mineral acres within the spacing unit Great Plains owned.  Multiplying 31%

by the 160 acre spacing unit yields 49.6 net acres within the spacing unit.  The 49.6 net acres

are then divided by the entire 160 acre spacing unit (49.6/160) and the quotient is multiplied by

the 1/8th royalty rate.  The result is the .03875 decimal listed in the Trustee's Assignment.[24]

ESCO and Basin do not dispute Preszler's method of calculating the fractional royalty

interest.[25]  Further, they concede that .03875 is the royalty interest Great Plains received from

the Ruppert Well.  Specifically, they state:  "the 31% Interest was described with a reference . . .

the royalty Great Plains received form the Ruppert well's production—.038750, which is equal to

the royalty of 1/8, multiplied by the interest Great Plains owned, 31% of the 160-acre spacing

unit, or 49.6 net acres, and divided by the entire number of acres in the spacing unit, 160

(1/8*49.6/160=.03875)."  Doc. 47, at 5.

In addition to the fractional royalty interests referenced in the Inventory, Notice of

Bankruptcy Sale and Assignment, the Appraisers' Report supports the proposition that the

Trustee intended to transfer only a royalty interest.  Specifically, the use of the term "royalty" in

the Appraisers' Report suggests that the appraisers only appraised a fractional royalty interest

in the oil and gas produced from the Ruppert 1 Well and not the net mineral acres.  See Ex.

EB–202, at 6.

Based on all the evidence, the Court is not convinced that the Trustee understood the

nature of Great Plains' interest in 124/400 net mineral acres and intended to convey it, but

---

[24] Preszler noted that all but one of the properties identified in the Inventory as "Royalty
Interests" contained a fractional interest determined by using the same type of calculation.

[25] Like with the fractional calculation for the 7/160 Interest, ESCO and Basin agree with the
method of calculating the fractional interest for the 31% Interest.  They state the following in
their brief: ".038750 . . . is equal to the royalty of 1/8, multiplied by the interest Great Plains
owned, 31% of the 160-acre spacing unit, or 49.6 net acres, and divided by the entire number of
acres in the spacing unit, 160 (1/8*49.6/160=.03875)."  Doc. 47, at 5.

mistakenly conveyed only a royalty interest.  The references to the fractional interest, which

required the Trustee to include the standard royalty rate in his calculation, together with the use

of the term "royalty" in the descriptions or headings suggest the Trustee was aware that Great

Plains owned a royalty interest and intended to transfer it.  More importantly, there is no

evidence that the transfer of a fractional royalty interest was a mistake.  ESCO and Basin's

request that the Court declare they are entitled to the 124/400 mineral acres and reform the

conveyance accordingly is denied.

> c.   Alleged mistakes regarding whether the Trustee transferred
>       overriding royalty interests or royalty interests.

ESCO and Basin also claim that the reference to "overriding" royalty is a mutual mistake

and request the Court to enter a declaration accordingly and grant its request for reformation.  In

support of their claim, ESCO and Basin assert that Great Plains never owned an overriding

royalty interest in the 7/160 Interest or the 31% Interest.  See Doc. 47, at 11.  Preszler also

opined that Great Plains did not own an overriding royalty interest in the Melvin E. Peterson 1

Well or in the Ruppert Well.  He suggested (and Great Plains argued) that because Great Plains

did not own an overriding interest at the time of the bankruptcy auction, ESCO would have

acquired no interest in the 7/160 Interest and the 31% Interest through the Trustee's

Assignment.  Preszler's testimony, when considered in the context of the other evidence,

supports the proposition that the Trustee transferred a royalty interest in this property.  In fact,

Preszler acknowledged that, despite Great Plains' mineral acres being subject to a lease, it had

the right to receive a royalty from the leased minerals.

Consistent with the proposition that the Trustee transferred "an interest" in the Ruppert 1

Well, Mau testified that ESCO holds an interest, and was paid for an interest, in this well.

Other evidence supports ESCO and Basin's assertion that the Trustee's reference to

"overriding" royalty interest was a mistake.  Specifically, the reference to the fractional royalty

interests in the descriptions of the 7/160 Interest and the 31% Interest in the Inventory, Notice of

Bankruptcy Sale and Assignment are inconsistent with the assignment of an overriding royalty interest, which the Assignment purports to convey.  An "overriding royalty" is an interest in addition to, and thus distinct from, a "royalty" interest.  Preszler testified that a 1/8th royalty rate was common at the time of this conveyance, and ESCO and Basin do not dispute this premise.  The fractional interests in the Assignment were calculated using the standard 1/8th royalty rate.  There is no evidence in the record suggesting that the standard 1/8th royalty rate was also the customary overriding royalty rate.  If the Trustee was assigning an overriding royalty, the fractional interest should have included a rate in addition to or different from the 1/8th standard royalty rate.  The Assignment included no such rate.

Further, when interpreting a deed, the column titled "Royalty" and the references to fractional royalty interests are more specific that the heading "Overriding Royalty."   As noted by the North Dakota Supreme Court, "a caption on a deed is of no effect where the conveyance is clear."  Rolla v. Tank, 2013 ND 175, ¶ 7, 837 N.W.2d 907, 910 (internal quotation and citation omitted).  The North Dakota Supreme Court has also clarified that "if a conflict exists between a specific provision and a general provision in a contract, the specific provision qualifies the general provision."  Id.  (quoting Kortum v. Johnson, 2008 ND 154, ¶ 44, 755 N.W.2d 432, 447).  Here, the specific fractional interest used by the Trustee qualifies the general description of an "overriding royalty."  Accordingly, ESCO and Basin have met their burden of showing that Great Plains did not own an overriding royalty interest, that the parties did not intend to convey an overriding royalty interest and the reference to an overriding royalty interest was a mistake.

In addition, the Court concludes that the mistake was mutual.  In deciding "whether or not a mutual mistake exists, the court can properly look into the surrounding circumstances and take into consideration all facts which disclose the intention of the parties."  Ritter, Laber and Assocs., Inc. v. Koch Oil, Inc., 2007 ND 163, ¶ 13, 740 N.W.2d 67, 72 (quoting Ell, 295 N.W.2d at 150).  At trial, ESCO and Basin offered evidence that Schwartz was unavailable to testify because he died.  The Court must, therefore, look to other evidence.  Given the circumstances

39

of the sale where Schwartz bid on all Great Plains' property offered for sale, the general premise that property buyers desire to achieve the benefit of a bargain, ESCO and Basin's efforts to maximize their property interest by arguing that the Trustee intended to sell and Schwartz intended to buy net mineral interests or, at the very least, royalty interests, it is reasonable to infer that Schwartz intended to purchase at least a royalty interest in the 7/160 Interest and the 31% Interest.

Also, after considering the circumstances of this case, the Court finds no evidence in support of the proposition that Great Plains owned or the Trustee intended to transfer an overriding royalty interest, other than general language in the Assignment and the heading on the Assignment attachment. On the other hand, the Court finds clear and convincing evidence that the Trustee intended to convey royalty interests to ESCO. Given the weight and credibility of other evidence received, the Court finds that the use of the term "overriding royalty interest" was a mutual mistake.

The Court concludes that the Assignment should have conveyed to ESCO a .005469 royalty interest in the Melvin E. Peterson 1 Well in the North Tioga Field Madison Unit in the northwest quarter of Section 8, Township 159 North, Range 94 West, in Burke County, North Dakota. In addition, the Assignment should have conveyed to ESCO a .03875 royalty interest in the Ruppert 1 Well in Portal Field in the south half and south half of the northeast quarter of Section 34, Township 164 North, Range 92 West, in Burke County, North Dakota. These conveyances shall be reformed and new conveyances issued to the extent, if any, that Great Plains owned a royalty interest in the described properties. See Global Fin. Servs., Inc. v. Duttenhefner, 1998 ND 53, ¶ 19, 575 N.W.2d 667, 671 ("The Court has often said an assignee acquires no greater rights than those of the assignor, and simply stands in the shoes of the assignor.").

The Court makes no finding as to the duration of the royalty interests the Trustee sought to convey to ESCO because the parties did not offer evidence sufficient to decide this issue.

40

Applying principles of contract interpretation, the Court reaches the same result.  The Assignment refers to overriding royalties, but the attachment to the Assignment refers to both "royalty" and "overriding royalty," which are different property interests.  An "overriding royalty" is an interest in addition to, and thus distinct from, a "royalty" interest.  The attachment is titled "Overriding Royalties," but contains a "Royalty" column.  The fact that the Assignment and attachment refer to both royalty and an overriding royalty interests creates ambiguity, subject to different interpretations.

Further, the inclusion of the fractional interests for the 7/160 Interest and the 31% Interest is inconsistent with the assignment of an overriding royalty interest, which the Assignment purports to convey.  The fractional interests in the Assignment were calculated using the standard 1/8th royalty rate.  If the Trustee was assigning an overriding royalty, the fractional interest should have included a rate in addition to or different from the 1/8th standard royalty rate.  There is no evidence in the record suggesting that the standard 1/8th royalty rate was also the customary overriding royalty rate.  As a result, the Assignment is subject to different interpretations and the Court may consider extrinsic evidence to determine the intent of the parties.  For the reasons included in the reformation analysis above, the Court declares that the Trustee intended to convey royalty interests in these properties.  The Assignment is deemed to have conveyed the royalty interests consistent with this conclusion.

4.    The Fossum Lease

ESCO and Basin claim that the Trustee intended to convey the entire leasehold interest Great Plains owned in the Fossum Lease.  Great Plains asserts that the Assignment does not list the Fossum #2 and Fossum #3 wells; the Assignment is unambiguous; and, therefore, the Trustee did not convey the entire interest Great Plains owned.  Instead, Great Plains asserts the Trustee only transferred an interest in the oil and gas produced from three wells:  Fossum #1, Fossum-FLB #1 and Fossum-FLB #2.  Great Plains further asserts that the Court should not reform the Assignment to add the Fossum #2 and Fossum #3 wells.

41

Unlike the first two interests, the evidence regarding the Fossum Lease shows that the Trustee knew that Great Plains owned an interest in the five Fossum wells.  The original Fossum Lease, which the parties agree was subsequently acquired by Great Plains, refers to three tracts of land.  The Inventory, Notice of Bankruptcy Sale and the Appraisers' Report all refer to five separate wells—Fossum #1, Fossum #2, Fossum #3, Fossum-FLB #1 and Fossum-FLB #2—all of which fall within the property described in the original lease.

The parties agree that Great Plains owned a leasehold interest in the entire tract of land described as the "Base Lease." A description of the "Base Lease" was listed multiple times in the Inventory.  The "Base Lease" legal description is the same as the legal description in the original lease, demonstrating that the Trustee was aware of the extent of Great Plains' leasehold interest.

Given that the Trustee arranged for an appraisal of Great Plains' interest in the Fossum #2 and Fossum #3 wells and given that he included the Fossum #2 and #3 wells in the Inventory and Notice of Bankruptcy Sale, the Court finds that the Trustee intended to convey these assets.  This conclusion is supported by the Trustee's testimony that he intended to convey all of the assets listed in the Notice of Bankruptcy Sale and had no intent to withhold any interest.  Accordingly, the Court finds clear and convincing evidence that the Trustee's failure to include a reference to the Fossum #2 and Fossum #3 wells and a legal description of the full leasehold interest in the assignment was a mistake.

In light of the circumstances of the auction sale where Schwartz bid on all Great Plains' property offered for sale, the general premise that property buyers desire to achieve the benefit of a bargain, ESCO and Basin's efforts to maximize their property interest by arguing that the Trustee intended to sell and Schwartz intended to buy an interest in the entire leasehold, it is reasonable to infer that the mistake was mutual.

Based on the Trustee's testimony that he intended to list for sale all of the property he had identified in the Inventory and to convey all the property identified and, given that a "Base

Lease" listing the entire tract of land in which Great Plains had a leasehold interest was listed in the Inventory, the Court concludes that the Trustee intended to assign an interest in the entire leasehold estate to ESCO.  Specifically, the Court concludes that the Assignment should have conveyed to ESCO the entire interest Great Plains owned in the Fossum oil and gas lease covering the north half and the southwest quarter of Section 29, the northeast quarter of Section 30, and the south half of Section 20, Township 161 North, Range 81 West, in Bottineau County, North Dakota.  The conveyance shall be reformed or a new conveyance issued to the extent, if any, that Great Plains owned a leasehold interest in the described property.

> 5.      The 55/240 Interest

The parties agree that Great Plains owned a 55/240 interest at the time this bankruptcy case was initiated.  Although Great Plains owned a 55/240 interest, the description in the Inventory refers to the interest as 55/320.  The Notice of Bankruptcy Sale refers to the interest as 55–320.  Likewise, the Trustee's Assignment reflects a conveyance of a 55/320 interest.

Preszler opined that the Assignment of a 55/320 interest conveyed less than Great Plains actually owned.  Preszler explained that the net mineral acres owned by Great Plains may be calculated by multiplying the fractional interest by gross acres.  In other words, multiplying 55/240 (the interest Great Plains actually owned) by 240 gross acres reveals that Great Plains owned 55 net mineral acres.  Preszler explained that when the 55/320 interest that the Trustee conveyed is multiplied by 240, the result is only 41.25 mineral acres.  Therefore, Preszler opined that the Trustee conveyed only 41.25 of the 55 mineral acres actually owned by Great Plains, leaving the bankruptcy estate with 13.75 mineral acres.  Consistent with Preszler's testimony, Great Plains argues that the Trustee reserved for the bankruptcy estate 13.75 mineral acres.

Unlike with the 7/160 Interest and the 31% Interest, where the Trustee's Assignment limited the conveyance to a royalty interest and where there was no evidence that the Trustee

43

knew Great Plains owned mineral acres, the Assignment of the 55/240 Interest conveys the actual mineral acres. Thus, the only issue is the size of the interest that Great Plains conveyed.

The Assignment provides that the Trustee conveyed "the entire interest of the bankrupt in and to all the oil, gas . . . and all other minerals and mineral substances . . ." to ESCO. Ex. EB–216. This Assignment differs from the Assignments transferring the other Disputed Assets in that it is the only Assignment specifically transferring the entire interest of the bankrupt. At trial, the Trustee testified that he did not intend to reserve any interest in these minerals for the bankruptcy estate. Accordingly, the Court finds that the reference to a 55/320 interest was a mistake.

Based on the circumstances of the auction sale where Schwartz bid on all Great Plains' property offered for sale, the language of the Assignment providing that "the entire interest of the bankrupt" was transferred, and ESCO and Basin's efforts to maximize their property interest by arguing that the Trustee intended to sell and Schwartz intended to buy 55 net mineral acres, it is reasonable to infer that the mistake was mutual.

The Court finds that the Assignment should have conveyed to ESCO the entire undivided 55/240 interest Great Plains held in the oil, gas, and all other minerals in and under the south half of the northwest quarter and the southwest quarter of Section 15, Township 163 North, Range 95 West, in Divide County, North Dakota. The conveyance shall be reformed or a new conveyance issued to the extent, if any, that Great Plains owned 55 net mineral acres in the described property.

### 6.    The 60/320 Interest

Great Plains concedes that a mistake was made with respect to the 60/320 Interest. Preszler testified that the Trustee's Assignment reflects an over-conveyance because Great Plains owned less than a 60/160 interest. Throughout this proceeding, ESCO and Basin claimed that the Trustee made a mistake; he should have conveyed a 60/320 interest. Preszler's testimony is consistent with this claim. He testified that the conveyance should have

44

listed the gross acres as 320 acres, not 160 acres.  Because there were actually 320 gross

acres, a conveyance of a 60/160 interest conveyed a total of 120 net acres when Great Plains

only owned 60 net mineral acres.  Accordingly, the Court concludes that the Assignment should

have conveyed to ESCO the entire undivided 60/320 interest Great Plains held in the oil, gas

and all other minerals in and under the northwest quarter of Section 27 and the southwest

quarter of Section 22, Township 163 North, Range 95 West, in Divide County, North Dakota.

The conveyance shall be reformed or a new conveyance issued to the extent, if any, that Great

Plains owned a 60/320 interest in the described property.

### III.    CONCLUSION

For the reasons stated above,

The Court concludes that the Assignment should have conveyed to ESCO a .005469

royalty interest in the Melvin E. Peterson 1 Well in the North Tioga Field Madison Unit in the

northwest quarter of Section 8, Township 159 North, Range 94 West, in Burke County, North

Dakota.  The Assignment also should have conveyed to ESCO a .03875 royalty interest in the

Ruppert 1 Well in Portal Field in the south half and south half of the northeast quarter of Section

34, Township 164 North, Range 92 West, in Burke County, North Dakota.  In addition, the

Assignment should have conveyed to ESCO the entire interest Great Plains owned in the

Fossum oil and gas lease covering the north half and the southwest quarter of Section 29, the

northeast quarter of Section 30, and the south half of Section 20, Township 161 North, Range

81 West, in Bottineau County, North Dakota.  Further, the Assignment should have conveyed to

ESCO the entire undivided 55/240 interest Great Plains held in the oil, gas, and all other

minerals in and under the south half of the northwest quarter and the southwest quarter of

Section 15, Township 163 North, Range 95 West, in Divide County, North Dakota.  Finally, the

Assignment should have conveyed to ESCO the entire undivided 60/320 interest Great Plains

owned in the oil, gas, and all other minerals in and under the northwest quarter of Section 27

45

and the southwest quarter of Section 22, Township 163 North, Range 95 West, in Divide County, North Dakota.

The conveyances shall be reformed and a new conveyance issued to the extent, if any, that Great Plains owned the interests described above.  Because Great Plains purchased the bankruptcy estate's interest in the Disputed Assets, IT IS ORDERED that Great Plains shall issue quit claim deeds or conveyances consistent with this opinion.

To the extent Great Plains Royalty Corporation seeks a remedy inconsistent with this Judgment, its cause of action is dismissed with prejudice.

To the extent Earl Schwartz Company and Basin Minerals, LLC seek a remedy in their counterclaim inconsistent with this Judgment, their cause of action is dismissed with prejudice.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this 18th day of March, 2015.


**SHON HASTINGS, JUDGE**
**UNITED STATES BANKRUPTCY COURT**

46